UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KAREN ECKER NICKEL,

        Plaintiff,

                                           Case Number 06-10476-BC
v.                                        Honorable Thomas L. Ludington

UNUM LIFE INSURANCE COMPANY OF
AMERICA, a Maine Corporation,

        Defendant.

_____/

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR
JUDGMENT TO REVERSE ADMINISTRATOR'S DECISION, DENYING
DEFENDANT'S MOTION FOR JUDGMENT AFFIRMING ERISA
DETERMINATION, AND REMANDING THE MATTER TO THE PLAN
ADMINISTRATOR FOR FURTHER DETERMINATION**

Plaintiff Karen Ecker Nickel ("Plaintiff") elected to participate in a disability insurance plan,

an employee welfare benefits plan under the Employee Retirement Income Security Act (ERISA),

29 U.S.C. §§ 1001, *et seq.*, administered by Defendant Unum Life Insurance Company of America

("Defendant").  According to Plaintiff's treating physicians, Plaintiff suffers from Chronic Fatigue

Syndrome ("CFS"), Lyme disease, Epstein-Barr virus ("EBV"), cardiomyopathy, and a host of other

illnesses.  Defendant denied Plaintiff's claim for long-term disability benefits, determining that

Plaintiff's medical records did not objectively establish that she was "disabled" under the definition

of the plan.  Plaintiff appealed, and Defendant reviewed and upheld its denial of benefits.  Plaintiff

seeks review of that decision in this Court.  29 U.S.C. § 1132(a)(1)(B).  The Court has considered

the parties' submissions and now concludes that Defendant's denial of benefits was arbitrary and

capricious.

Although the cross motions were scheduled for hearing before this Court on February 14, 2008, the Court has reviewed the parties' submissions and finds that the relevant law and facts have been set forth in the briefs. The Court concludes that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. *Compare* E.D. Mich. LR 7.1(e)(2).

I

Plaintiff is a cytotechnologist at the MidMichigan Medical Center ("MMC") in Midland, Michigan. Administrative Record ("AR") at 17. Plaintiff worked as cytotechnologist at MMC from September 15, 1997 until January 22, 2004. *Id.* Plaintiff stopped working because she suffered from unusual fatigue and weakness, shortness of breath, chest pain, exhaustion, and an inability to move for extended periods of time. Plaintiff received short term disability benefits from January 30 until April 23, 2004. *Id.* Eventually, her treating physicians diagnosed Plaintiff with multiple illnesses, including CFS, EBV, Lyme disease, and cardiomyopathy. On March 22, 2004, Plaintiff submitted an application to Defendant for long term disability benefits. *Id.*

A cytotechnologist is a specialized lab technician that evaluates patient cell samples to identify particular types of cells and cellular abnormalities. According to a MMC job description, a cytotechnologist's principal duties and responsibilities include "examin[ing] patient slides for cancer and other abnormalities," "coordinat[ing] and maintain[ing] quality assurance," "perform[ing] special techniques," and "enter[ing] data and generat[ing] reports." AR at 21. MMC requires that a cytotechnologist be able to lift twenty pounds, be dexterous "including handling, reaching, grasping, fingering, and feeling," be able to handle multiple tasks and be able to freely

move around the department and hospital. *Id.* "Typical working conditions" of a cytotechnologist at MMC includes "frequently [being] required to sit [or] stand for long periods of time." *Id.*

Defendant provided MMC employees with group long term disability insurance. AR at 97. The policy provided that Defendant had "discretionary authority both to determine an employee's eligibility for benefits and to construe the terms of [the] policy." AR at 102. The policy defined "disability" and "disabled" as follows:

'Disability' and 'disabled' mean that because of injury or sickness:

> 1. the insured cannot perform each of the material duties of his regular occupation; or
>
> 2. the insured, while unable to perform all of the material duties of his regular occupation on a full-time basis, is:
>
>> a. performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis; and
>>
>> b. earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness.

AR at 107.

Plaintiff's claim form indicated that she first noticed symptoms in 2000 and sought treatment on September 29, 2003. AR at 30. She was unable to work due to her "insufficient" energy level and "worsening fatigue." *Id.* Her illness prohibited her from performing physical activities, such as performing biopsies. *Id.*

Plaintiff's co-worker noticed a decline in Plaintiff's health and working abilities. AR at 232. She noticed that Plaintiff was "unable to perform with any consistency the basic functions of [a cytotechnologist]" and had difficulty walking down the hall or up stairs. AR at 232-33. Plaintiff's

supervisor was concerned about Plaintiff's "extreme fatigue and tremors" and did not allow her to participate in morning biopsies. *Id.*; AR at 236.

Plaintiff's primary physician was A. Martin Lerner, M.D. Dr. Lerner was the clinical professor of internal medicine at Wayne State University and a Governor of the American College of Physicians. AR at 587. Moreover, Dr. Lerner has co-authored multiple scholarly articles regarding the relationship between CFS and other illnesses, including EBV and cardiomyopathy. AR at 614-20, 621-26, 627-32, 633-59, 670-77, 678-91, 692-96, 697-703.

Dr. Lerner diagnosed Plaintiff with CFS, EBV, cardiomyopathy, thyroiditis, and Lyme disease. Plaintiff frequently sought medical care from Dr. Lerner during and after 2003. At Dr. Lerner's request, Plaintiff underwent a series of tests at William Beaumont Hospital on October 17, 2003. AR at 63-65. One of those tests was a twelve minute exercise test on a "Bruce Protocol," which indicated that Plaintiff reached 99% of her anticipated heart rate without cardiac complaints. AR at 64.

On October 23, 2003, Dr. Lerner opined that the results from a Holter monitor were consistent with myocardial disease. AR at 361. He also discussed the prescription of Valtrex to "inhibit the multiplication of Epstein-Barr virus." *Id.* On November 11, 2003, Dr. Lerner began Plaintiff on Valtrex. AR at 362. He described her energy index point score to be "barely" five out of a possible ten point scale. *Id.*

On January 23, 2004, Dr. Lerner noted that Plaintiff "does not look well" and is "really struggling." AR at 360. He observed a "persistent" EBV infection, and an EBV-EA score of 79. *Id.* Plaintiff complained of lightheadedness, palpitations, and chest aches. *Id.* Dr. Lerner recommended that Plaintiff take six weeks off of work and continue to take Valtrex. *Id.*

On March 2, 2004, Dr. Lerner again noted "persistent" EBV infection and her "EBV-EA is a high positive, 82." *Id.* He also diagnosed hypothyroidism and noted that the Valtrex does not appear to be working. *Id.* Additionally, Dr. Lerner found her energy index score to be 3.5, which indicated that Plaintiff was bedridden eighteen to twenty hours a day. To that point, Dr. Lerner had not found any signs of improvement in Plaintiff's condition. *Id.*

On July 12, 2004, Dr. Lerner noted that Plaintiff's energy index dropped to 2.5, which indicated she possessed the energy to be out of bed for four hours a day. AR at 467. Plaintiff experienced palpitations and muscle aches, and she experienced lightheadedness. *Id.* Plaintiff's EBV-EA score was 92.

At the request of Defendant, a board certified specialist in family practice, Dr. Tanya Horne, reviewed Plaintiff's medical records. AR at 393. Dr. Horne was unimpressed with Plaintiff's EBV diagnosis because of an absence of IgG antibodies that are usually present in an EBV infected patient. AR at 408. Dr. Horne did not find any evidence of cardiomyopathy, but did find "evidence of hypothyroidism." *Id.* Dr. Horne attempted to contact Dr. Lerner via telephone to clarify some ambiguities, but Dr. Lerner was unwilling to speak with her. AR at 408-09. Dr. Horne spoke with Dr. Lerner's assistant, however, who referred Dr. Horne to Dr. Lerner's internet site. *Id.* Dr. Horne eventually concluded that cardiomyopathy could not be properly diagnosed with a Holter monitor. AR at 409. Her report reflected that she confirmed this conclusion with Defendant's in-house cardiologist. AR at 409. Additionally, she emphasized that Plaintiff's performance on the Bruce Protocol twelve minute stress test yielded results that were inconsistent with a total lack of work capacity. AR at 409. Finally, Dr. Horne concluded that, in her judgment, the objective medical

information did not support a diagnosis of EBV and that CFS can not be diagnosed by a cardiac study.  *Id.*

On May 4, 2004, Defendant's disability benefits specialist, Andrew Grider,  denied Plaintiff's long term benefits application.  AR 146-48.  Defendant relied on Dr. Horne's conclusions to determine that Plaintiff's medical records did not support her assertion that she totally lacked work capacity.  AR at 146.  Defendant did not find any "objective data to support a diagnosis of acute or persistent [EBV]."  *Id.*  Defendant relied on Plaintiff's "above normal exercise capacity" demonstrated in an exercise stress test.  *Id.*  Defendant also found that testing did not indicate any "evidence of cardiomyopathy."  *Id.*  Defendant concluded that Plaintiff did not meet the policy's definition of disabled.  *Id.*

On May 31, 2005, the Social Security Administration ("SSA") denied Plaintiff's claim of disability for benefits.  AR at 1561-65.  The SSA "determined that [Plaintiff's] condition is not severe enough to keep [Plaintiff] from working," but recognized that Plaintiff's "condition prevents [Plaintiff] from doing [her] past job(s)."  AR at 1561-62.  Ultimately, the SSA concluded that Plaintiff was not disabled under its definition of "disabled" because Plaintiff could find work that "does not require as much lifting" and not as "complicated" as her previous employment.  AR at 1562.

Plaintiff appealed Defendant's denial of her application.  AR at 215.  In support of her appeal, Plaintiff supplemented the record multiple times prior to Defendant's final decision.

On August 25, 2004, Joseph Natole, M.D., a specialist in family practice, drafted a letter diagnosing Plaintiff's illnesses addressed "to whom it may concern."  AR at 253-54.  Dr. Natole believed Plaintiff to be afflicted with narcolepsy, CFS, EBV, Hashimoto's thyroiditis, mitral valve

prolapse, and alphal antitrypsin deficiency. *Id.* As a result, Dr. Natole recommended that Plaintiff "be considered completely and totally disabled due to her medical condition." AR at 254.

On September 10, 2004, Dr. Lerner drafted a letter further explaining his diagnoses. AR at 239-40. He determined that Plaintiff met "all of the criteria for the definition of the chronic fatigue syndrome" and ECG monitoring confirms that finding. AR at 239. Dr. Lerner also opined that Plaintiff's energy level was low and indicated that four to six hours a day was her maximum amount of time out of bed. *Id.* Moreover, Dr. Lerner indicated that Plaintiff's "persistently high antibody to early antigen" supports the diagnosis of EBV. *Id.* Additionally, a "Holter monitor" documented evidence of cardiomyopathy. *Id.*

On January 5, 2005, Kim Brothers, R.N., Defendant's senior clinical consultant, prepared a "medical response" on behalf of Defendant after reviewing Plaintiff's medical records. AR at 1112-14. Brothers recognized that Plaintiff's records indicated Plaintiff had tremors in her hands, joint aches, and muscle aches. *Id.* She found Plaintiff's claim to be a "complex case" and recommended further review of Plaintiff's records by a physician. AR at 1114.

On January 7, 2005, R. A. Hill, M.D., Defendant's vice president and medical director, also prepared a "medical response" on behalf of Defendant. Dr. Hill, a board certified physician in family practice, concluded that Plaintiff's medical records "d[id] not establish, within the bounds of standard medical science, the diagnoses proposed nor do they provide sufficient physical exam or functional capacity evidence to support any restrictions and limitations." AR at 1121. Dr. Hill recommended that Defendant obtain an Independent Medical Examination ("IME") from "an infectious disease specialist with expertise in [CFS] issues." *Id.* Dr. Hill specifically requested that

the IME not make a determination of whether Plaintiff was "disabled," but requests that the IME "describe specific restrictions and limitations" for Plaintiff. AR at 1122.

After having difficulty locating a specialist to perform the IME in Detroit or Chicago, Defendants retained Jerrold S. Dreyer, M.D., an infectious disease specialist located in California. AR at 1162, 1229. On June 1, 2005, Dr. Dreyer issued a report after reviewing Plaintiff's medical records, medical journals and articles, affidavits, and Plaintiff's job description. AR at 1229-37. The report does not indicate that Dr. Dreyer physically examined Plaintiff in person. See *Id.* Dr. Dreyer found the dual diagnoses of CFS and Lyme disease contradictory, and found that the anecdotal and clinical evidence did not support a finding of Lyme disease. AR at 1237. Next, Dr. Dreyer found Dr. Lerner's medical conclusions concerning the relationship between, EBV, cardiomyopathy and CFS compelling, but that his hypotheses concerning CFS are not generally accepted by the medical field. AR at 1238. He found "sufficient documentation . . . to support the label of [CFS]," but is "unable to describe specific restrictions and limitations . . ." AR at 1239.

On June 20, 2005, Dr. Hill prepared a report in response to the June 1, 2005 IME performed by Dr. Dreyer. AR at 1260-61. Dr. Hill opined that the label of CFS did not indicate her functional capacity. AR at 1260. Instead, Dr. Hill believed that "the most important element in the evaluation of functional capacity is whether the AP has actually assessed the functional capacity or is assigning restrictions and limitations based on the patient's perception of ability. The assignment of the label should not create the assumption of lack of functional capacity." AR at 1260 (emphasis omitted). He opined that "the medical records do not describe physical exam abnormalities or deficits of functional capacity sufficient to support the restrictions and limitations as described." AR at 1261. Dr. Hill stated that "functional capacity evaluation can be useful to determine capacity and to define

specific restrictions and limitations, especially when the occupation in question is sedentary. However, these evaluations are less useful in determining capacity for prolonged activity, although there are some criteria they (sic) can be useful for these purposes." *Id.* Dr. Hill concluded "within a reasonable degree of medical certainty that it would be reasonable for [Plaintiff] to attempt at least a part-time sedentary activity . . ." *Id.* (emphasis omitted.)

On October 4, 2005, a physical therapist, Patrick Howe, issued a report from a Functional Capacity Evaluation ["FCE"]. AR at 1704-16. The FCE appears to have been a series of lifting, strength, and mobility tests. AR at 1711-15. It is unclear from Howe's written report, however, the manner in which these tests correlate to Plaintiff's ability to perform her duties as a full-time cytotechnologist. See AR at 1704. Howe found that Plaintiff "completed the exam with maximum effort" with consistent physical responses. AR at 1704. Howe concluded that "[g]iven Plaintiff's complaint of chronic fatigue is episodic in nature and she presented no physiological deficits during the examination . . . I believe that the she could perform light duty work which is appropriate for a Cytotechnologist, at least on a part time basis." *Id.* According to the FCE, "light" duty work consists of occasionally lifting twenty pounds and frequently lifting ten pounds, whereas, sedentary work only requires the occasional lifting of ten pounds. AR at 1705.

On October 17, 2004, Dr. Dreyer prepared an additional report evaluating supplemental medical records and responding to criticism regarding his previous report made by Plaintiff's counsel. AR at 1692-97. These supplemental records included positive Lyme disease test results, literature on Lyme disease, Plaintiff's affidavit stating that she visited wooded areas every year and received a strange "fly bite" in 1990, and the SSA's denial of her application for benefits. AR at 1692-93. Dr. Dreyer also reviewed "job information for a cytotechnologist including necessary

qualifications, education, knowledge, experience and main duties." AR at 1693. Dr. Dreyer affirmed his conclusion that overall review of the report does not objectively indicate that Plaintiff is inflicted with EBV. AR at 1695. Dr. Dreyer doubts the diagnosis of Lyme disease because Plaintiff's most recent exposure to ticks occurred twelve years prior, in 1990. AR at 1696. He also doubts the quality of the testing that produced positive Lyme disease and Borreliosis results because such testing is "fraught with errors." *Id.* Dr. Dreyer recognizes, however, that "I clearly stated that [Plaintiff] suffered from CFS. This implies that she is disabled and unable to perform her duties as a cytotechnologist." *Id.* Despite acknowledging the diagnosis of CFS, he concludes that the multiple diagnoses "shed doubt on the voracity (sic) of [Plaintiff]." *Id.* It does not appear that Dr. Dreyer reviewed the FCE report prepared by Howe.

On November 16, 2005, Dr. Hill issued a report in response to Dr. Dreyer's report and the FCE. AR at 1741. Dr. Hill concluded that Plaintiff's functional capacity could not be "implied" from the diagnosis of CFS, absent additional data. *Id.* Dr. Hill opined that people inflicted with CFS have varying "levels of functional capacity." *Id.* Dr Hill also reasoned that Dr. Dreyer and Dr. Lerner do not "ha[ve] any expertise in contract interpretation, that [neither] was aware of the definition of disability in [Plaintiff's] contract or that [neither] has any expertise in vocational analysis." *Id.* Dr. Hill was persuaded by the FCE results that Plaintiff "demonstrated the ability to perform at the Light/Med physical demand level." As a result, Dr. Hill concluded that Plaintiff "has the ability to maintain sustained activity in the light/medium range." *Id.*

On November 29, 2005, Defendant's appeals consultant, Jennifer Gates, denied Plaintiff's appeal and affirmed the previous conclusion that Plaintiff did not meet the plan's definition of "disabled." AR at 1746-56. Defendant relied on Dr. Horne's conclusion that she was unable to find

any evidence of cardiomyopathy and that the medical records did not contain any objective evidence of hypothyroidism. AR at 1747. Defendant rejected Plaintiff's EBV diagnosis because her test results did not detect IgG antibodies. *Id.* Additionally, Defendant did not accept that Dr. Lerner diagnosed CFS through a diagnostic cardiac study. *Id.* Defendant stated that:

> A total lack of work capacity from the LDW (last date worked) of 1/22/04 to the present is not supported. This is based on:
>
> - A lack of objective data to support a diagnosis of acute or persistent EBV.
> - [Plaintiff's] performance on exercise stress testing showed no evidence of impairment with above normal exercise capacity.
> - No evidence of cardiomyopathy with normal ejection fraction and wall motion.
> - Normal physical exam findings, no documentation of muscle weakness or loss of function.

*Id.* The letter relied heavily on the previous discussed medical record reviews by Dr. Hill, Dr. Dreyer, and others. AR at 1749-51.

Defendant's denial of benefits recognized Dr. Dreyer's conclusion that Plaintiff suffers from CFS, which "implies that [Plaintiff] is disabled and unable to perform her duties as a cytotechnologist." AR at 1754. Defendant disputed the "implication," however, relying on the Dr. Hill's conclusions drawn from the FCE results. *Id.* Dr. Hill concluded that Plaintiff's strong physical results on the FCE demonstrated that Plaintiff, with CFS, is capable of "sustained activity in the light/medium range." *Id.* Ultimately, Defendant concluded that Plaintiff was not disabled because her medical records generally indicated that she could perform a sedentary job on a part time basis.

Plaintiff filed the instant complaint on February 2, 2006.

II

Section 502(a)(1)(B) of ERISA authorizes an individual to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Previously, the Court concluded that the arbitrary and capricious standard of review applies to Defendant's denial of long term benefits. See Dkt. # 31 at 12. This highly deferential review is appropriate when the ERISA-regulated plan at issue clearly grants discretion to the plan administrator. *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595, 597 (6th Cir. 2001).

The Sixth Circuit has described the arbitrary and capricious standard of review as "the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003) (internal quotations and citation omitted). When applying this standard, the Court must determine whether the administrator's decision was reasonable in light of the available record evidence. Although the evidence may be sufficient to support a finding of disability, if there is a reasonable explanation for the administrator's decision denying benefits in light of the plan's provisions, then the decision was neither arbitrary nor capricious. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). Yet the deferential standard of review does not equate with using a rubber stamp – a court must review the quantity and quality of the medical evidence on each side. *Evans v. Unumprovident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006).

A decision reviewed according to the arbitrary and capricious standard must be upheld if it is supported by "substantial evidence." *Baker v. United Mine Workers of America Health &*

*Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991). Substantial evidence supports an administrator's decision if the evidence is "rational in light of the plan's provisions." *See Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). A court generally considers only that evidence presented to the plan administrator at the time he or she determined the employee's eligibility in accordance with the plan's terms. *Id.* The Court's review, thus, is limited to the administrative record. *See Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 618 (6th Cir. 1998).

Additionally, courts have seen fit to note other administrative decisions: "[a social security] determination, though certainly not binding, is far from meaningless." *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 294 (6th Cir. 2005). In *Glenn*, 461 F.3d at 668-669, the Sixth Circuit treated a plan administrator's failure to consider a social security decision of disability and its grant of benefits as a significant factor when reviewing the plan administrator's decision. Although the standards applicable to ERISA cases do not equate with the standards applicable to social security cases, a finding of disability within a social security context indicates that at least one entity concluded that medical evidence did support a finding of disability.

Furthermore, courts "must take into consideration [a plan administrator] is acting under a potential conflict of interest because it is both the decision maker, determining which claims are covered, and also the payor of those claims." *Calvert*, 409 F.3d at 292 (citing *Marks v. Newcourt Credit Group*, 342 F.3d 444, 457 (6th Cir. 2003). Though the arbitrary and capricious standard "remains unchanged," courts should still consider the conflict of interest when "applying the standard." *Id.* (emphasis omitted). Thus, courts may consider a variety of factors in reviewing whether a plan administrator's determination was arbitrary and capricious.

III

As a starting point, Defendant's denial is predicated on the finding that Plaintiff does not fit within the policy's definition of "disabled," which is the "insured cannot perform each of the material duties of his regular occupation." It is undisputed that Plaintiff's regular occupation is that of a cytotechnologist. From the record, it appears that Plaintiff's material duties included performing cellular biopsies, preparing reports, and communicating biopsy results.

The Court notes that the instant case provides unique set of circumstances because Plaintiff asserts that she suffers from multiple illnesses. In all likelihood, Plaintiff could meet the policy's definition of "disabled" by adequately demonstrating the requisite disabling effect of any of the illnesses. The voluminous administrative record documents the medical opinions of Plaintiff's treating physicians, an independent medical examiner, Defendant's reviewing physicians, and Defendant's medical director. Additionally, the administrative record demonstrates that Plaintiff's medical condition seriously affected her ability to adequately perform her duties as a cytotechnologist.

In concluding that Plaintiff, did not fit the definition of "disabled," Defendant initially determined that Plaintiff's "medical records contain no objective data to support a diagnosis of acute or persistent [EBV]" AR at 146. Defendants also found "no evidence of cardiomyopathy" and that "her records indicate[d] normal physical findings," including "no documentation of muscle weakness or loss of function." *Id.* Approximately nineteen months later, Defendant affirmed its earlier conclusion that Plaintiff did not meet the policy's definition of "disabled." Again, Defendant concluded that Plaintiff's medical records "lack[ed] objective data to support a diagnosis of acute or persistent EBV" and "[n]o evidence of cardiomyopathy." AR at 1747. Defendants also

confirmed normal physical findings, bolstered by Plaintiff's "performance on exercise stress testing [that] showed no evidence of impairment with above normal exercise capacity." *Id.*

First, Defendant denied Plaintiff's claim for "[a] lack of objective data to support a diagnosis of acute or persistent EBV. Defendant relied on Dr. Horne's finding that Plaintiff's test results did not indicate the presence of IgG, an EBV antibody. Dr. Horne indicates that in her medical opinion a finding of EBV based solely on the presence EBV-EA is inconclusive. Though the record contains some objective evidence to support the diagnosis of EBV, Dr. Horne provides a reasonable basis to disagree with the diagnosis of EBV. Thus, the Court concludes that Defendant's reliance on Dr. Horne's finding regarding the diagnosis of EBV reasonable, in light of her findings.

Similarly, Defendant relied on Dr. Horne's medical opinion that it is not a generally accepted medical practice to diagnose cardiomyopathy based on results from a Holter Monitor. Again, Dr. Horne disputed the medical data that Dr. Lerner relied upon in offering a diagnosis. Moreover, Dr. Horne relied on additional tests that reported "normal wall motion and ejection fraction" as indicating Plaintiff did not suffer from cardiomyopathy. The Court finds, once again, that Defendant had a basis supported by the record to reach the conclusion that Plaintiff's diagnosis of cardiomyopathy does not indicate that she is disabled.

Additionally, the Court recognizes that Dr. Horne attempted to clarify Dr. Lerner's diagnoses by speaking with him, but Dr. Lerner would not speak with her. Instead, his assistant referred Dr. Horne to his internet page. In the Court's view, this demonstrates that Dr. Horne undertook substantial effort to understand Dr. Lerner's diagnoses and her conclusions appear to provide a reasonable basis for Defendant to rely upon.

Next, Defendant rejected the diagnosis of Lyme disease, relying particularly on Dr. Dreyer's IME, which concluded that the dual diagnosis of CFS and Lyme disease was contradictory. Additionally, Dr. Dreyer found that anecdotal and clinical evidence did not support a finding of Lyme disease. Similar to Dr. Horne's conclusions, Dr. Dreyer's findings provide an adequate basis for Defendant to deny Plaintiff's application for long term benefits on the basis of Lyme disease.

Finally, the Court turns its attention to the diagnosis of CFS. First, the Court finds it noteworthy that Defendant relied on the outside medical opinions of Dr. Horne and Dr. Dreyer in disputing the diagnoses of EBV, cardiomyopathy, and Lyme disease. With respect to each of these illnesses, the record demonstrated defined differences of opinion between Plaintiff's treating physicians and Dr. Horne or Dr. Dreyer. Dr. Horne and Dr. Dreyer offered reasoned explanations disputing the diagnoses, such that denying Plaintiff's application on these grounds was not arbitrary and capricious.

Defendant does not have such a reasoned basis to deny Plaintiff's application based on the diagnosis of CFS. First, the administrative record sets forth detailed medical records demonstrating that Plaintiff suffers from severe fatigue. Dr. Lerner noted Plaintiff's extreme fatigue and estimated that Plaintiff low energy level allowed her to be out of bed between four to six hours a day. He found that Plaintiff met "all of the criteria for the definition of [CFS]."

Plaintiff's coworker's affidavits corroborated Plaintiff's claim of extreme fatigue. Their affidavits stated that Plaintiff's fatigue has materially affected her ability to perform her duties. Specifically, Plaintiff's supervisor would not allow Plaintiff to perform morning biopsies because of "extreme fatigue and tremors." AR at 232-33, 236. Moreover, Plaintiff was unable to consistently perform the "basic functions" of a cytotechnologist.

After Defendant's initial denial of Plaintiff's application, Defendant's senior clinical consultant, Kim Brothers, recognized that Plaintiff's medical history was "complex" and required further review by a physician. Brothers also noted Plaintiff's complaints of tremors and aches in her muscles and joints. Soon thereafter, Dr. Hill, Defendant's vice president and medical director, reviewed Plaintiff's medical records and found that the diagnoses were not supported by evidence. Dr. Hill, however, recommended that "an infectious disease specialist with expertise in [CFS] issues" review Plaintiff's medical records.

Dr. Dreyer performed the IME and found the manner in which Dr. Lerner diagnosed CFS not to be generally accepted in the medical field. Dr. Dreyer noted, however, that "sufficient documentation" existed to support a "label of CFS." He concluded that he was "unable to describe specific restrictions and limitations." Upon receipt of Dr. Dreyer's report, Dr. Hill issued a report contending that the "label of CFS" does not indicate her functional capacity. Dr. Hill concluded that Plaintiff's medical records do not describe physical exam abnormalities or deficits of functional capacity.

After Plaintiff's counsel voiced his complaints with Dr. Dreyer's report, Dr. Dreyer issued a supplemental report. In preparation of that report, Dr. Dreyer reviewed additional documents including a job description of a cytotechnologist. With respect to the diagnosis of CFS, Dr. Dreyer concluded that he "clearly stated that [Plaintiff] suffered from CFS. This implies that she is disabled and unable to perform her duties as a cytotechnologist." AR at 1696.

Again, Dr. Hill responded to Dr. Dreyer's conclusions stating that people with CFS have varying "levels of functional capacity." AR at 1741. Additionally, Dr. Hill states that Dr. Dreyer does not have "any expertise in contract interpretation" and does not understand the definition of

"disability" under the policy. Dr. Hill also contended that Dr. Dreyer does not have "any expertise in vocational status." Ultimately, Dr. Hill was persuaded by the FCE, which in Dr. Hill's view "demonstrated [Plaintiff's] ability to maintain sustained activity in the light/medium range." *Id.*

Taken as a whole, the record demonstrates that Defendant's denial of Plaintiff's application on the basis of CFS was arbitrary and capricious. Defendants initially denied the application primarily ignoring Plaintiff's CFS diagnosis. Defendant's senior clinical consultant recognized the "complex" nature of Plaintiff's medical record. Dr. Hill reviewed it and recommended an IME. Defendants were unable to acquire a local physician to perform the medical review, despite requesting review by twenty-three Michigan physicians. Moreover, it appears that the physician that performed the IME, Dr. Dreyer, never examined Plaintiff in person. Instead, he reviewed Plaintiff's records. Dr. Dreyer, a specialist in infectious diseases, concluded that Plaintiff suffered from CFS. Dr. Dreyer's first report conclude that he was unable to recommend any limitations or restrictions. Dr. Hill reviewed Dr. Dreyer's report, and concluded that the "label of CFS" did not demonstrate any limitations. Dr. Dreyer authored a second report in which he acknowledges that he "clearly stated" that Plaintiff is inflicted with CFS, which "implies that she is disabled and unable to perform her duties as a cytotechnologist." The Court notes that Dr. Dreyer reviewed her job description prior to authoring his report. Dr. Hill issued a final report in which he disputed Dr. Dreyer's conclusions, contending that Dr. Dreyer is not an expert in "contract interpretation" or "vocational status." Dr. Hill then relied on the FCE results to affirm his conclusion that she is not disabled under the policy.

As stated above, the policy defines "disabled" as the "insured cannot perform each of the material duties of his regular occupation." Though Dr. Dreyer is not an expert in contract interpretation or vocational status, he is a board certified specialist in infectious diseases. After

review of Plaintiff's medical records and job description, Dr. Dreyer agreed with Plaintiff's treating physicians that Plaintiff suffered from CFS. He concluded that there is an implication that she is unable to perform her duties.

Dr. Hill initially recommended that an infectious disease specialist with expertise in CFS review Plaintiff's medical records. After Dr. Dreyer initially reviewed the report, Dr. Hill drafted a report that attempted to downplay the significance of Dr. Dreyer's conclusion that the record supported the "label of CFS." Dr. Dreyer's follow-up report, stated that Plaintiff suffered from CFS, which implies she is disabled, and unable to perform her duties as a cytotechnologist.

Dr. Hill disagreed with Dr. Dreyer because Dr. Hill believed that Dr. Dreyer offered opinions outside of his expertise. Dr. Hill's responsibility as Defendant's vice president and medical director, however, appears to inform on his medical analysis. The record demonstrates that Plaintiff's treating physicians believed that she is inflicted with CFS. Dr. Dreyer, an expert from the Court's view of the record, determined that she suffers from CFS, which implies she is unable to perform her duties. Essentially, Dr. Dreyer affirmed Dr. Lerner's diagnosis of CFS. In the view of the Court, this is significant because the results of the IME affirmed the conclusions of Dr. Lerner, a physician experienced in treating CFS. Moreover, Dr. Lerner's conclusions were based on physical examinations of Plaintiff, unlike any of Defendant's relied upon physicians. Finally, the record demonstrates that other than Dr. Hill, only Dr. Horne disagrees with the diagnosis of CFS, but she merely disputed the manner in which Dr. Lerner diagnosed CFS.

Additionally, Dr. Hill responded to Dr. Dreyer's report by concluding that the FCE demonstrated that Plaintiff was able to undertake sedentary work in a part time basis. It appears that Dr. Hill relied on the FCE, a three hour physical exam, as the basis of his medical conclusion. The

FCE recognized the "episodic" nature of CFS and that Plaintiff did not demonstrate any physiological deficits during the exam. It also appears that the administrator of the exam was not a licensed physician. Though the FCE administrator's medical conclusions are persuasive, they must be viewed in context. The FCE is a single day test, whereas the entire medical record spans years of treatment. Dr. Dreyer reviewed almost the entire administrative record and concluded that Plaintiff suffered from CFS. Moreover, Dr. Dreyer never had an opportunity to consider the FCE results in conjunction with the record. The Court finds that Dr. Hill's reliance on the FCE as the determining factor to be arbitrary and capricious in light of the entire record. Dr. Hill, as an interested party, was the only physician to interpret the FCE, which ultimately was the determinative factor in denying Plaintiff's application.

Additionally, the Court finds the conclusions of the SSA relevant to this point. Though the SSA denied Plaintiff's claim for disability, the SSA concluded that Plaintiff's "condition prevents her from doing [her] past job(s)." It appear to the Court that the SSA found that Plaintiff's condition meets the definition of disabled under the policy.

In light of the voluminous evidence that supports Plaintiff's CFS claim, Defendant's reliance on the Dr. Hill's interpretation of the FCE is arbitrary and capricious. Thus, the Court will grant Plaintiff's motion to reverse the administrator's decision and deny Defendant's motion to affirm judgment.

Finally, the Court notes that Defendant objected to Plaintiff's reliance on evidence outside the administrative record. See Dkt. # 40 at 5-6. In reaching its conclusions, the Court has only relied on the administrative record and the information contained therein.

IV

The Courts finds that Defendant's denial of Plaintiff's application to be arbitrary and capricious in light of the plan's provisions and in light of the evidence contained in the administrative record. It is within the Court's discretion to determine whether the appropriate remedy is to remand the matter to the plan administrator or award benefits to Plaintiff. *Elliott v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 621-22 (6th Cir. 2006). "[W]here the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled, the appropriate remedy generally is remand to the plan administrator." *Id.* at 622 (quotations omitted) (*citing Buffonge v. Prudential Ins. Co. of America*, 426 F.3d 20, 31-32 (1st Cir. 2005).

In the instant matter, the record indicates that Defendant's determination lacked a reasoned basis in light of the conclusions of Dr. Dreyer. Notwithstanding the fact that Plaintiff is inflicted with CFS, the question remains whether she is able to perform the functions of her employment as a cytotechnologist. The Court recognizes that it is "not a medical specialist[]" and determinating whether Plaintiff is disabled is not the Court's judgment to make. *Id.* Thus, the Court will remand the matter to the plan administrator for further determination.

Accordingly, it is **ORDERED** that Plaintiff's motion for judgment to reverse administrator's denial of long-term disability benefits [Dkt. #35] is **GRANTED**. This matter is **REMANDED** to the plan administrator for a full and fair inquiry.

It is further **ORDERED** that Defendant's motion for judgment affirming ERISA

determination [Dkt. #33] is **DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: March 3, 2008

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on March 3, 2008.

s/Tracy A. Jacobs
TRACY A. JACOBS
